9 F.3d 110
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
UNITED STATES of America, Plaintiff-Appellant,
v.
Kevin Keith THOMAS (92-6207), Barry D. Thomas (92-6208),
Defendants-Appellees.
 Nos. 92-6207, 92-6208.
 United States Court of Appeals, Sixth Circuit.
 Aug. 31, 1993.
 
 Before RYAN and BOGGS, Circuit Judges, and ROSEN, District Judge.*
 PER CURIAM:
 
 
 1
 The government, in an interlocutory appeal, seeks to have evidence seized during the execution of two search warrants for the residences of Kevin Keith Thomas and Barry D. Thomas admitted in the criminal proceedings against them. The district court held both that there was insufficient probable cause in the search warrant affidavit and that the government could not avail itself of the good faith exception to the exclusionary rule. For the reasons given below, we reverse.
 
 
 2
 * On March 8, 1990, two search warrants were issued, one for 700 Adella Drive[1] and one for 1018 Beverly Hills Drive. The warrants were executed that day and returned on March 9.
 
 
 3
 On January 6, 1992, Kevin Thomas was charged in federal court in a three-count information: count I was for manufacturing marijuana in March 1990, in violation of 21 U.S.C. Secs. 841(a)(1) and 841(b)(1)(B). Count II charged that any and all interest Kevin Thomas had in real property at 700 Adella Drive was forfeited to the government by virtue of the marijuana manufacturing alleged in Count I. Count III charged that Kevin Thomas's interest in the real property at 1018 Beverly Hills Drive was also forfeited to the government by virtue of the marijuana manufacturing alleged in Count I. Also on January 6, Barry Thomas was charged in a one-count information with manufacturing marijuana in March 1990, in violation of 21 U.S.C. Secs. 841(a)(1) and 841(b)(1)(B).
 
 
 4
 On February 10, 1992, both Thomases filed motions to suppress the evidence seized from the residences. After a hearing on the motion to suppress, a United States magistrate judge recommended that the evidence be suppressed because there was insufficient probable cause to support the issuance of the warrants. Overruling government objections to the report, the district judge adopted the magistrate judge's report and recommendation. He then referred the matter back to the magistrate judge to determine whether the evidence was admissible under the good faith exception to the exclusionary rule, United States v. Leon, 468 U.S. 897, 104 S.Ct. 3405 (1984).
 
 
 5
 The magistrate concluded that the government had failed to show objective good faith. Thus, he recommended that the evidence be suppressed. Once again the government objected, and once again the district judge adopted the recommendation. The government appealed.
 
 II
 
 6
 The search warrant was based on the following information. On October 30, 1989, an anonymous letter was sent to the Knoxville, Tennessee office of the Drug Enforcement Agency (DEA).[2] The text of the letter stated:
 
 
 7
 ABC News just featured a 46-state bust of indoor marijuana growers (mentioning a check of utility bills); "48 Hours" recently featured the use of aerial infra-red surveillance in arresting an indoor grower.
 
 
 8
 Here's a tip from a disgruntled customer who has seen it all first-hand: three 1000 watt halide lights with many HUGE marijuana plants underneath and several flourescents [sic] over literally HUNDREDS of small cuttings ready to sell and transplant! Anyone care to see for yourself?
 
 Kevin Thomas
 
 9
 700 Adella Av.
 
 Seiverville, [sic] TN
 
 10
 His brother Barry, who with his wife was arrested in Knoxville last spring with 100 plants growing in a bedroom, helped Kevin cultivate and harvest a BUMPER outdoor crop this fall from the islands of Douglas Lake; they are both holding now, and Barry is sure to hang lamps again as soon as he's released from probation.
 
 
 11
 Kevin is about to harvest his "Basement Bud" and laugh all the way to the bank AGAIN. He thinks he lives in Mayberry RFD: "What are they gonna do ... send Barney out here with a bullet?"
 
 
 12
 On January 23, 1990, a second undated anonymous letter was received in the DEA office. That letter stated:
 
 
 13
 Barry and Angie are at it again, this time in their workshed at their residence on Beverly Hills Dr. in Sevierville; this house is owned by Barry's brother
 
 Kevin Thomas
 
 14
 400 Adella Av.
 
 Sevierville, TN.[3]
 
 15
 Kevin is conspiring with his brother and sister-in-law to again cultivate marijuana, just after Barry and Angie were released from unsupervised probation for a November 1988 simple possession conviction resulting from a May 1988 arrest for cultivation (see enclosed newspaper clippings)--the pair even received record expungement after the successful completion of their probation period (11 months 29 days), during which time (the summer of 1989) they boldly cultivated marijuana on the islands of Douglas Lake with Kevin Thomas!
 
 
 16
 Kevin also grows pot in his basement, from which Barry and Angie obtained the cuttings to maintain their continuing criminal enterprise. Since Kevin owns the property and they succeeded in bringing in a record harvest last summer--despite the fact they were caught red-handed in Knoxville--Barry and Angie feel they can break the law with impunity.
 
 
 17
 These criminals' bravado will suffice to do them in should this tip prompt you gentlemen to initiate an investigation, since their deluded egomania ignores such facts as:
 
 
 18
 the workshed is unattached to their home, placing it outside the curtiledge [sic] of the residence--permission from their neighbor to approach the same might well result in the detection of the pungent odor of flowering (an officer with experience and/or a trained canine), or hear the hum of high intensity discharge lamp ballasts in operation (tax assessors need no permission to tresspass) [sic];
 
 
 19
 they have plans to install an air conditioner, which would be in operation during freezing outside temperatures;
 
 
 20
 there is an air turbine installed upon the workshed roof to evacuate heat and moisture, turning at high speeds even in the calmest of winds and in freezing temperatures;
 
 
 21
 black plastic clearly covers the window to prevent the bright lights from leaking through;
 
 
 22
 the electricity consumption is much higher than normal for the area, and much higher than last year at the same location (Kevin shut down this operation site immediately upon Barry and Angie being arrested), attributable only to the use of grow lights;
 
 
 23
 infra-red heat detection aerial surveillance will show high levels of heat loss from a supposedly unoccupied building, which can only result from hot grow lights and transpiration of growing plants;
 
 
 24
 after transplanting and harvesting, they must dispose of waste materials (unmarketable stems and root systems)--while they are wise enough not to put these materials out for garbage pickup, they don't think they are "hot" enough to be followed while transporting the same and depositing it in a landfill or, more likely, in a commercial dumpster;
 
 
 25
 their hydroponic medium of choice is Pro-Mix BX soiless [sic] mix, purchased at Knox Seed Supply in Knoxville, packaged in black 80 lb. bales--these are large containers which must be carried in plain sight from their auto, across their yard, and into their workshed for use;
 
 
 26
 ground surveillance would show Kevin also entering the "greenhouse," which should not only result in another conviction but also in another warrant to search his primary residence and charge his wife for their basement garden--forfieture [sic] of both homes necessarily follows.
 
 
 27
 Surely you have additional methods to collect evidence to show probable cause for a search warrant, and just as surely you know how best to compile the same to make it stand up in court so that these criminals' civil liberties are not infringed upon in the process.
 
 
 28
 Their first harvest since Barry, Angie, and their Great Danes moved in is expected no later than the middle of February and no later than late March: they expect to harvest every three months after that.
 
 
 29
 Good hunting!
 
 
 30
 The following information was either corroborated by the police or developed independently.
 
 
 31
 1) The Adella property had been transferred to Kevin and Amy Thomas on September 23, 1987. Electric company records showed the service for the Adella home was in the name of Kevin Thomas. The telephone directory listed Kevin Thomas at 700 Adella.
 
 
 32
 2) The Beverly Hills property was transferred in 1983 to Kevin Keith Thomas and Amy Sue Thomas. The electric company showed service at that address in the name of Angie Thomas as of November 27, 1989. Prior to that date, Kevin Thomas had electric service at that address.
 
 
 33
 3) The electric bills were obtained and attached to the affidavit. They showed that the August, September, October, and November 1989 bills for both residences were higher than for the January 1990 reading, which covered the month of December 1989. Furthermore, December 1989 was an extremely cold month with record-breaking low temperatures in East Tennessee. Tennessee Bureau of Investigation Special Agent Monroe (the affiant) claimed in the affidavit that such a pattern was consistent with an indoor growing operation. The electrical usage did not show reasonable seasonal variations. Furthermore, usage was abnormally high. For example, for several months at the Beverly Hills property the usage was consistently over 3,000 kilowatt hours per month.
 
 
 34
 4) Surveillance of the Beverly Hills property revealed a two-story beige outbuilding with a brown roof. On top of the roof was a rotating ventilator shaft that appeared to let warm air escape from the building. The officer said that it was rotating even in still air, and his inference was that the building was used to grow marijuana. There was also a dog pen with two Great Danes on the property. Two vehicles, one registered to Barry D. Thomas and one registered to Angela Thomas, were parked in front of the house. Officers also noticed a white female drive the vehicle registered to Angela Thomas, and later noticed the same vehicle parked at the Adella property.
 
 
 35
 5) Surveillance of the Adella property revealed a vehicle registered to Kevin K. Thomas.
 
 
 36
 6) Using a hand-held thermal imaging device, a DEA agent determined that the detached garage at the Adella property had a brighter white image than either the residence on that property or than other residences located nearby. The agent also determined that the outbuilding at the Beverly Hills address also produced a brighter white image than either the residence on the property or than other residences located nearby. Higher levels of heat produce brighter white images on the device than do lower levels of heat.
 
 
 37
 7) Barry and Angie Thomas had been arrested on May 15, 1988 and charged with cultivating and growing marijuana. Arrest reports indicated that 100 marijuana plants had been found growing in their residence in Knoxville. Public information in newspaper articles had not mentioned the number of plants recovered, although the October 30 anonymous letter said they had been caught with 100 plants in the bedroom.
 
 
 38
 8) Two packages of unidentified supplies were sent from Superior Growers Supply to the Beverly Hills address. The shipping name used was Pence,[4] though there was no one by that name listed in the Sevierville telephone directory as of January 30, 1990.
 
 III
 
 39
 We review the district court's legal conclusion de novo. Because no oral or other supplemental information was provided to the magistrate, the probable cause analysis is limited to the four corners of the affidavit. Whiteley v. Warden, 401 U.S. 560, 565 n. 8 (1971); Aguilar v. Texas, 378 U.S. 108, 109 n. 1, 84 S.Ct. 1509, 1511 n. 1 (1964).
 
 
 40
 When a magistrate reviews a warrant request, he must determine whether, under the totality of the circumstances, there is probable cause to issue the warrant. Illinois v. Gates, 462 U.S. 213, 103 S.Ct. 2317 (1983). When the government uses an anonymous letter as part of the basis for the probable cause, it must corroborate the reliability of that letter. Great deference should be accorded the magistrate who issues the warrant. Massachusetts v. Upton, 466 U.S. 727, 733, 104 S.Ct. 2085, 2088 (1984).
 
 
 41
 In this case, there were very specific allegations made in the two letters. It was not clear whether the letter-writers in both cases were the same person, but both letters were extremely specific. The letters implied a substantial familiarity with the operations at both Thomases' residences. Though even the detailed knowledge displayed in the letters would not have been enough, standing alone, to justify issuance of a warrant, much of the information amenable to corroboration was corroborated by the police.
 
 
 42
 A number of corroborated items were seemingly innocent. But corroboration of apparently innocent items is sufficient to support issuance of a warrant when there are enough items and they are particular. Other information in the letters was inculpating and non-public, such as the knowledge that there were approximately 100 plants seized in the earlier arrest.
 
 
 43
 The evidence for searching the residence on Beverly Hills Drive was less specific and substantial than that for the Adella residence. However, the government rightly argues that the volume and specificity of the information on the Adella residence makes the requirement for the information on the Beverly Hills less stringent. This can be compared with the use of information from a confidential informant (CI) with a good track record. With a proven, reliable CI, warrants can properly issue on very little additional information. The warrant issues in large measure on the basis of the informant's track record. In this case, the information for the Adella residence was good, specific, and corroborated, creating a natural inference that the information on the Beverly Hills residence was equally reliable.
 
 
 44
 Defendants claim that there were several statements in the anonymous letters that either were refuted by the officers' observations or that were amenable to corroboration but were not in fact corroborated. But the officers need not verify each and every statement in the letters for a magistrate to find probable cause. Nor does every single statement need to be accurate, so long as the general reliability of the tipster is confirmed, and the officers made no material misrepresentations or omissions before the magistrate that affected the judgment on probable cause. In this case, looking at the totality of the circumstances, and particularly when giving deference to the issuing magistrate, there was more than enough probable cause to support the issuance of the warrant.
 
 
 45
 Finally, the defendants claim the information was stale and that therefore the warrant should not have issued. Different offenses have different periods of time in which the government can act on information before it is considered stale. A marijuana growing operation, in which the marijuana must grow to maturity and then be harvested, has a longer lifetime of relevant data than a cocaine distribution operation in which all sales may be consummated within hours of delivery. See United States v. Greany, 929 F.2d 523, 525 (9th Cir.1991) (nearly two-year old information on marijuana growing operation upheld, staleness evaluated in light of particular facts of case and nature of criminal activity and property sought); United States v. Dozier, 844, F.2d 701, 707 (9th Cir.1988) (marijuana cultivation is long-term crime; even "substantial" time lapse not controlling on staleness).
 
 
 46
 In this case, the magistrate judge at the suppression hearing and the district judge actually evaluated the affidavit de novo, and independently concluded there was insufficient probable cause. We hold that, looking at the totality of the evidence, there was ample probable cause to support the issuance of a warrant, particularly when granting appropriate deference to the issuing magistrate. The pattern of electrical usage was unusual, both because it was high and because it was steady, showing very little seasonal variation. The anonymous letters were very specific and much of the information in the letters was corroborated, supporting their overall accuracy. In addition, there was evidence of activity consistent with a marijuana growing operation, including the purchase of the growing supplies and the ventilator rotating in calm air.
 
 IV
 
 47
 Because we find that there was sufficient probable cause in the affidavit to support the issuance of the warrant, we need not address the issue raised by the government of reliance on the good faith exception to the exclusionary rule. Therefore, we REVERSE the district court, and REMAND for further proceedings in conformity with this opinion.
 
 
 
 *
 The Honorable Gerald E. Rosen, United States District Judge for the Eastern District of Michigan, sitting by designation
 
 
 [1]
 Defense counsel points out that the Kevin Thomas residence was at 700 Adella Avenue
 
 
 [2]
 The letter was also copied by "cc" to other law enforcement agencies
 
 
 [3]
 700 Adella Av., the address in the first letter, was correct
 
 
 [4]
 The warrant affidavits show the name of Richard Spence, but the actual shipping record showed the material going to Pence. Agent Monroe testified that he had made an error in checking the records and preparing the affidavits